# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CINDY WILLIAMS, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. 12 C 05115 |
| v. | ) ) | Judge Edmond E. Chang |
| TCF NATIONAL BANK, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cindy Williams brought this proposed class action suit against TCF National Bank, alleging that TCF, as a provider of banking and debit card payment services, violated several state laws by charging excessive overdraft fees [R. 1].[1] Before the Court is TCF's motion to compel arbitration [R. 10]. For the reasons explained below, the motion to compel arbitration is granted.

## I. Background

TCF is a national bank that issues debit cards to its checking account customers. R. 1, Compl. ¶¶ 17-18. According to Williams, after a TCF customer pays for an item with a TCF debit card, TCF manipulates the sequence in which debit-card transactions

---

[1] The Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). Under this statute, district courts have jurisdiction of any class action in which the matter in controversy exceeds $5,000,000, as long as any member of a class of plaintiffs is a citizen of a different state from any defendant. 28 U.S.C. § 1332(d)(2)(A). Here, Williams and TCF are citizens of different states; Williams is a citizen of Illinois and TCF is a citizen of South Dakota. R. 1, Compl. ¶ 16; R. 34 ¶ 1. The parties also agree, solely for the purposes of establishing subject matter jurisdiction, that the amount in controversy exceeds $5,000,000: TCF has received more than $30,000,000 in overdraft and returned item fees (which is the subject matter of Williams's Complaint) during the alleged time period. R. 34 ¶ 2.

are cleared through the customer's checking account in the hopes of charging the customer multiple overdraft fees. *Id.* ¶¶ 19-21. Williams further alleges that TCF inadequately disclosed its overdraft policies and failed to adequately notify customers of overdrafts and account balances. *Id.* at ¶¶ 22-45.

Williams became a TCF customer in 2006. *Id.* ¶ 54. When she opened her checking account, Williams filled out an Account Agreement. R. 22-1, Pl.'s Aff. ¶ 10. Part of the Agreement reads, "By signing this Agreement, You state that You have received a copy of this Agreement; TCF's Terms and Conditions for Checking and Savings Accounts . . . all of which are part of Your Account Contract with TCF." R. 10-2, Def.'s Exh. A (Account Agreement) at 1. Williams initialed under that provision, signifying that she "unders[tood] and agree[d] to these provisions set forth above." *Id.* The next page of the Account Agreement contains a separate text box:

> Disputes under this account may be subject to binding arbitration if either you or TCF so elects. If TCF elects to arbitrate any such dispute, you will have no right to a jury trial for that dispute, and vice versa, and certain other consequences apply. See "Arbitration of Disputes" in the Account Contract.

*Id.* at 2. Williams likewise initialed under this provision. *See id.*

Among the documents included in the Account Contract are TCF's Terms and Conditions. During the time period that Williams was one of TCF's customers—from 2006 to late 2011, *see* Compl. ¶ 54—TCF promulgated two versions of the Terms: one effective on January 14, 2005 (2005 Terms), the other revised (and presumably effective) on October 18, 2011 (2011 Terms). *See* R. 10-4, Def.'s Exh. C (2005 Terms); R. 10-3, Def.'s Exh. B (2011 Terms). Relevant to this motion, the two sets of Terms both

contain arbitration provisions. *See* 2011 Terms at 32-39; 2005 Terms at 15-21. The 2005 Terms provide, "In the event of a dispute involving You or TCF, either You or TCF may elect to resolve the Claim by binding arbitration, provided that the electing party notifies the other party in writing of the demand for arbitration." 2005 Terms at 16. The 2011 Terms contain a similar arbitration provision:

> This Arbitration Agreement governs when and how any disputes between you and TCF will be arbitrated—instead of decided in court—even if one party (you or TCF) initially chooses to bring the case in court.

> Binding arbitration means that you and TCF must follow the arbitration process and rules and must do whatever the Arbitrator decides. That process will result in an award by the Arbitrator resolving the Claim.

2011 Terms at 34.

These arbitration provisions also allow a customer to reject them, so long as the customer provides a written rejection notice to TCF within 30 days. *See* 2005 Terms at 15-16; 2011 Terms at 38-39. Rejections under the Terms have no effect on "any other provision[s] of [the] Account Contract or the status of [the] Account." 2005 Terms at 16; 2011 Terms at 39.

After Williams opened her checking account with TCF, she was issued a debit card. Compl. ¶ 54. According to Williams, she was then charged with numerous overdraft fees for debit-card transactions even when there were sufficient funds in her account to cover the transactions at the time they took place. Compl. ¶¶ 55-56. She alleges that this experience is representative of other TCF customers' experiences, Compl. ¶ 66, and filed a proposed class-action complaint against TCF. Based on the Account Agreement and Account Contract, TCF filed this motion to compel arbitration.

## II. Analysis

Under the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq*., if the parties have an arbitration agreement and the asserted claims are within its scope, a motion to compel arbitration must be granted. 9 U.S.C. §§ 3-4; *Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 726 (7th Cir. 2004) (citing *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.,* 174 F.3d 907, 909 (7th Cir. 1999)). The FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Accordingly, section 3 of the FAA specifically requires granting a motion to stay a lawsuit where "the issue involved in such suit . . . is referable to arbitration" under a written agreement. 9 U.S.C. § 3. And Section 4 requires that the court order the parties to proceed in arbitration if there is an agreement to arbitrate. 9 U.S.C. § 4.

Here, Williams does not dispute that the subject matter of her lawsuit—the overdraft fees charged by TCF for its customers' debit card purchases—is arbitrable under TCF's arbitration provision. *See generally* R. 22, Pl.'s Resp. Instead, Williams advances two main arguments in opposing arbitration: (1) the arbitration agreement is invalid, and (2) even if valid, the arbitration agreement is unconscionable. This Court addresses each theory in turn.

## A. Validity of the Arbitration Agreement

At the outset, Williams argues that the arbitration agreement contained in the Terms is invalid. In Illinois,[2] the validity of arbitration agreements is "to be analyzed using ordinary principles of contract law," including "whether the basic ingredients of a contract—offer, acceptance, and consideration—are present." *Carey v. Richards Bldg. Supply Co.*, 856 N.E.2d 24, 27 (Ill. App. Ct. 2006) (internal quotation marks and citation omitted). Here, Williams challenges the element of acceptance: because TCF did not provide her with the arbitration provision until *after* she signed the Account Agreement,[3] Williams contends that she did not accept the arbitration agreement. *See* Pl.'s Aff. ¶ 8; Pl.'s Resp. at 5.

In Illinois, however, a party to a contract for consumer goods and services is bound by the contract's terms, even if unread at the exact moment of agreement, as long as the party was provided an opportunity to reject the contract later. *See, e.g.*, *Bess v. DirecTV, Inc.*, 885 N.E.2d 488, 496-97 (Ill. App. Ct. 2008). In *Bess*, a satellite television subscriber was deemed to be bound by an arbitration provision, even though she did not receive the customer agreement containing the arbitration provision at the time she ordered the satellite television service. *See id.* The customer agreement

---

[2]To determine the validity of an arbitration provision, "a federal court should look to the state law that ordinarily governs the formation of contracts." *Koveleskie v. SBC Capital Mkts., Inc.*, 167 F.3d 361, 366-67 (7th Cir. 1999) (internal quotation mark and citation omitted). The parties agree that this Court should apply the contract law of Illinois, the state where all relevant events in this dispute arose. *Id.* at 367.

[3]TCF agrees that she did not receive the arbitration agreement contained in the Terms until after she signed the Account Agreement. R. 25, Def.'s Reply at 5.

permitted the subscriber to cancel service upon receiving the customer agreement, but she did not do so, and thus was stuck with the arbitration provision when she continued to accept the satellite television service. *Id.* at 491, 497.

Similarly, in *Hill v. Gateway 2000*, a computer buyer was deemed bound by the terms of an arbitration agreement—even though he did not receive the agreement at the time he ordered the computer—once he kept the computer. *See* 105 F.3d 1147, 1149 (7th Cir. 1997). In so ruling, the court in *Hill* noted that "[p]ractical considerations support allowing vendors to enclose the full legal terms with their products," because "[c]ustomers as a group are better off when vendors skip costly and ineffectual steps . . . and use instead a simple approve-or-return device." *Id.* Although the satellite subscriber in *Bess* actually read the terms of the agreement and yet continued to accept the satellite television service, *Hill* makes clear that the fact that the subscriber actually read the arbitration provision is *not* needed to bind a consumer to an arbitration provision: "Competent adults are bound by such documents, read or unread." *Id.*

So even if it is true that Williams, like the customers in *Bess* and *Hill*, did not receive the arbitration provision contained in the Terms until after she signed the Account Agreement, she is still bound by the provision. Like the customers in *Bess* and *Hill*, Williams had an opportunity to reject the provision. Williams avers that she received the Terms after she signed the Account Agreement but "before [she] left the bank kiosk." Pl.'s Aff. ¶ 12. Both the 2005 Terms and the 2011 Terms allow TCF customers to reject the arbitration provision by mailing a written notice of rejection

within 30 days. *See* 2005 Terms at 15-16; 2011 Terms at 38-39. This rejection method is even less onerous than the approve-or-return-the-product methods used by the merchants in *Bess* and *Hill*: here, TCF customers can continue to receive TCF banking services even after rejecting arbitration. *See* 2005 Terms at 16 ("If You reject this Arbitration provision, that does not affect any other provision of Your Account Contract or the status of Your Account."); 2011 Terms at 39 (same language). The parties agree that Williams never rejected the arbitration provision. Thus, once Williams received the Terms—regardless of whether she read it or not—and did not reject arbitration in the roughly four-and-a-half years that she continued banking with TCF, *see* Compl. ¶ 54, she was bound by the arbitration agreement. *See Hill,* 105 F.3d at 1149; *Bess*, 885 N.E.2d at 496-97.

Williams relies on a few cases in resisting arbitration, but the reliance is misplaced. Williams first characterizes *Boulevard Bank National Association v. Philips Medical Systems International B.V.* as holding that a signing party is bound to obligations arising from a document incorporated by reference, but not actually attached to the contract, *only* if the party has actual knowledge of the document's terms. *See* 15 F.3d 1419, 1424 (7th Cir. 1994); *see also* Pl.'s Resp. at 5-6. Williams stretches *Boulevard Bank*'s actual holding too far. There, the Seventh Circuit held that where a signing party knows that an exhibit contains certain terms, the party cannot invalidate the contract merely because the exhibit had not been physically attached to the contract. *See Boulevard Bank,* 15 F.3d at 1424. Put another way, if a party knows the exhibit's terms, then the party is bound by the contract even if the exhibit is not

7

attached to the contract. Williams takes that holding and commits the fallacy of working backwards from the specific facts to an overbroad general rule: she argues that if an exhibit is not attached to a contract, and the party does not already know the exhibit's terms, then the party is not bound by those terms. What is missing from that argument is the rest of the story, supplied by the holdings in *Bess* and *Hill*: a consumer *is* bound by the contract's terms, even if unread at the agreement's formation, as long as the party was given a chance to reject the contract later. Here, Williams admits that she received the Terms by the time she left the TCF kiosk, and she did have a chance to reject the arbitration provision after the contract's initial formation. This fact also distinguishes *Newton v. American Debt Services, Inc.*, another case Williams cites for the proposition that an arbitration provision provided to a party after she signed the contract is invalid. *See* 854 F. Supp.2d 712, 721 (N.D. Cal. 2012); Pl.'s Resp. at 6. Even had *Newton* applied Illinois contract law instead of California contract law in requiring that "the terms of the . . . document . . . be known *or easily available* to the contracting parties," *id.* (internal quotation mark and citation omitted) (emphasis added), the requirement that the terms were "easily available" was met here because Williams had actual possession of the Terms.

As a matter of law, then, Williams accepted the arbitration agreement. The other two elements of contract formation are also satisfied: TCF offered her the arbitration agreement, and she agreed to it in consideration of receiving banking services. *See Boomer v. AT&T Corp.*, 309 F.3d 404, 416 (7th Cir. 2002) ("In this case, [defendant's] promise to continue telephone services (something it was not obligated

to do) induced [plaintiff's] corresponding promise . . . to arbitrate, and thus there was a bargained-for exchange and consideration."). The arbitration agreement is therefore valid because it meets the offer-acceptance-consideration formula for contract formation.

## B. Unconscionability of the Arbitration Agreement

Williams alternatively argues that the arbitration agreement, even if valid, is unenforceable because it is unconscionable. There are two ways that an agreement might be unconscionable: procedurally (the *manner* in which the agreement was made was unconscionable) and substantively (even if the manner of reaching agreement was fine, the agreement itself is just too lopsided in favor of one party). Williams advances both types of unconscionability arguments. On procedure, she contends that (1) the language of the Account Agreement misled her into believing that arbitration was mandatory, and (2) specific provisions in the Terms coerce TCF customers into accepting the arbitration agreement. On substance, she argues that (1) the arbitration provision is illusory because of a one-sided modification clause in the Terms, (2) the arbitration provision contains exceptions or carve-outs that only benefit TCF, and (3) the provision requires TCF customers to pay all arbitration costs in excess of $2,500 and all costs of appeal. *See generally* Pl.'s Resp.

## 1. Multiple Versions of the Terms

As a threshold matter, this Court must determine which version of the Terms governs, the 2005 version or the 2011 version. Arguing that unconscionability is assessed at the time of contract formation, not performance, Williams asserts that the

arbitration provision contained in the 2005 Terms applies because that was the one in effect when she signed the Account Agreement. *See* Pl.'s Resp. at 7. In support, Williams cites *Sanders v. Michigan Avenue National Bank*, 662 N.E.2d 602, 611 (Ill. App. Ct. 1996). TCF, for its part, cites *AT&T Mobility LLC v. Concepcion*, — U.S. —, 131 S. Ct. 1740, 1744 (2011), in contending that the 2011 Terms control because they were in effect when Williams closed her account. R. 25, Def.'s Reply at 14 n.4. Neither citation is convincing. There was only one version of an arbitration agreement in *Sanders*. *See* 662 N.E.2d at 611. And although there were multiple revisions of an arbitration provision in *Concepcion*, the parties there agreed that the last revision controlled, but there is no such agreement here. 131 S. Ct. at 1744.

In *Kinkel v. Cingular Wireless, LLC,* the Illinois Supreme Court, when faced with this question, seemed to approve applying whatever was the most recent governing version of the arbitration provision between the parties. 857 N.E.2d 250, 260 (Ill. 2006). It is true that, on the facts of *Kinkel*, it turned out that the arbitration provision in effect at the time of contract formation was the governing version. But that was only because the consumer in that case terminated her contract with the merchant *before* the final modification of the arbitration agreement. *See id.* at 259. Although the consumer had agreed that the merchant could unilaterally modify the agreement at any time, she had ended the contract before the modification date. *Id.* In those circumstances, the original version of the arbitration provision applied because the merchant "did not have the right to unilaterally modify the terms of a contract that had been terminated many months prior to the attempted modification." *Id.* There

would have been no need, however, for the Illinois Supreme Court to inquire into which version applied at the time of the contract's termination if the general rule was that the version at contract formation always governs. Instead, *Kinkel* suggests that post-formation modifications *can* apply, so long as the modifications went into effect before the contract's end.

Here, like the consumer in *Kinkel*, Williams agreed to the unilateral-modification clause contained in the Terms that were in effect when she opened her account. *See* 2005 Terms at 5. The Terms were revised on October 18, 2011, *see* 2011 Terms, cover page, but Williams does not state exactly when she closed her TCF checking account. *See* Compl. ¶ 54 ("Plaintiff was a checking account customer of TCF until late 2011."). Nevertheless, Williams, in her response brief, failed to dispute TCF's contention that she closed her account in December 2011. *See* R. 11, Def.'s Mot. Compel at 3 n.1 ("The Arbitration provision in the Terms and Conditions in effect when Plaintiff's Account was closed in December 2011 is identical . . . ."). By not responding, she in effect concedes the point. *See Portillo-Rendon v. Holder*, 662 F.3d 815, 817 (7th Cir. 2011). So—unlike the consumer in *Kinkel*—Williams was still an account holder when the Terms were revised on October 18, 2011. Under *Kinkel*'s reasoning incorporating "the law of contracts regarding modification," 857 N.E.2d at 259, TCF can hold Williams to the arbitration clause contained in the 2011 Terms because it was modified before she closed her account. In any event, the Court also will analyze unconscionability under the 2005 Terms; as discussed below, it turns out that the result is the same under either the 2005 or 2011 version.

11

## 2. Procedural Unconscionability

Under the Federal Arbitration Act, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. As mentioned above, in Illinois, "[u]nconscionability takes two general forms; an agreement may be unenforceable if it is either procedurally or substantively unconscionable." *Phoenix Ins. Co. v. Rosen*, 949 N.E.2d 639, 647 (Ill. 2011) (citing *Kinkel,* 857 N.E.2d at 263). *Kinkel* also makes clear that a finding of unconscionability may be based on a combination of both procedure and substantive unconscionability. 857 N.E.2d at 263.

Procedural unconscionability refers to a contract "where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it." *Kinkel*, 857 N.E. at 264 (internal quotation mark and citation omitted). This procedural form of unconscionability "consists of some impropriety during the process of forming the contract depriving a party of a meaningful choice." *Frank's Maint. & Eng'g, Inc. v. C.A. Roberts Co.*, 408 N.E.2d 403, 410 (Ill. App. Ct. 1980) (citation omitted). In analyzing procedural unconscionability, courts consider "the manner in which the contract was entered into, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print." *Id.*

### a. Language of the Account Agreement

First, Williams argues that the portion of the Account Agreement that mentions arbitration gave no indication that she could reject arbitration, so she was misled into

believing that it was mandatory when she opened her account. *See* Def.'s Resp. at 9. The language in the Account Agreement that Williams complains about says:

> Disputes under this account may be subject to binding arbitration if either you or TCF so elects. If TCF elects to arbitrate any such dispute, you will have no right to a jury trial for that dispute, and vice versa, and certain other consequences apply. See "Arbitration of Disputes" in the Account Contract.

Account Agreement at 2. Williams asserts that this language states that arbitration was mandatory. The core problem with this argument is that the paragraph's last sentence explicitly directed Williams to "[s]ee 'Arbitration of Disputes' in the Account Contract." When signing up for the bank account, Williams initialed this language, signifying that she understood it and agreed. *See id.* Elsewhere, the Account Agreement defined the Account Contract as including the Terms. *See id.* at 1. She initialed and signed under that provision too. *Id.* Thus, she understood that the Account Agreement directed her to review the arbitration provision in the Terms.

Having been so directed, Williams should have not have thought that arbitration was mandatory. To be sure, the arbitration provision warned of the mandatory *consequences* of accepting arbitration. *See* 2011 Terms at 34 ("Binding arbitration means that you and TCF must follow the arbitration process and rules and must do whatever the Arbitrator decides."); 2005 Terms at 16 (same language). But that is not the same as *requiring* arbitration in the first place. To the contrary, as both version of the Terms made plain, Williams could have rejected arbitration without affecting her account status had she submitted a written rejection notice within 30 days. *See* 2011 Terms at 38-39; 2005 Terms at 15-16; *see also Pivoris v. TCF Fin. Corp.*, 2007 WL

4355040, at *4 (N.D. Ill. Dec. 7, 2007) ("Most importantly, Plaintiff had the unfettered right to opt out of the arbitration provision. These circumstances defeat a claim of procedural unconscionability."). This rejection clause explains why the language she cites in the Account Agreement is not mandatory but is instead couched in conditional, not absolute, terms. *See* Account Agreement at 2 ("Disputes under this account *may* be subject to binding arbitration *if* either you or TCF *so elects*." (emphases added)).

The cases that Williams cites do not support her contention of procedural unconscionability. She cites to *NAACP of Camden County East v. Foulke Management Corp.,* 24 A.3d 777 (N.J. Super. Ct. App. Div. 2011), to argue that the relationship between the Account Agreement and the arbitration provision was too confusing. *See* Pl.'s Resp. at 9. But the consumer in *Foulke* confronted multiple inconsistent and confusing arbitration provisions scattered across three separate documents. 24 A.3d at 793-94. In contrast, there is only one arbitration provision here, referred to in a consistent manner by the Account Agreement. Similarly, Williams argues that an Illinois Appellate Court decision, *Frank's Maintenance*, prevents the enforcement of arbitration provisions that are essentially hidden.[4] 408 N.E.2d at 411; *see also* Pl.'s Resp. at 9-10. The contract in *Frank's Maintenance* referred to an arbitration clause on the reverse side of the agreement, but the referring clause "was stamped over,

---

[4]To the extent that Williams contends that the text of the arbitration provision is visually misleading, that argument fails. The text of both the 2011 Terms and the 2005 Terms is "in full-size font, with introductory titles and subtitles, most paragraphs are one or two short sentences and each paragraph is set off by a blank line above and below." *All Am. Roofing, Inc. v. Zurich Am. Ins. Co.*, 934 N.E.2d 679, 692 (Ill. App. Ct. 2010). These attributes of the text's visual presentation defeat any argument that the text is visually misleading. *See id.*

indicating that [the] legend was irrelevant." *Id.* That is not this case, where the Account Agreement's reference to the arbitration provision in the Terms was in plain view—as Williams herself acknowledged when she initialed underneath it. *See* Account Agreement at 2. Williams thus had a "reasonable opportunity to understand the terms of the contract," *Frank's Maintenance*, 408 N.E.2d at 410, and nothing in the text prevented her from understanding the contract.

### b. Economic Coercion

Second, Williams argues that the arbitration provision is procedurally unconscionable because the 2011 Terms purportedly require customers to pay all of TCF's attorney's fees and costs in any action to enforce the Terms, except for those incurred during arbitration. Under this reading of the provision, Williams contends, customers are compelled to accept arbitration through economic duress. *See* Pl.'s Resp. at 10. To support this contention, Williams cites no legal authority. Instead, she points to a provision in the Terms entitled "Default and Collection Costs," which provides:

> To the extent the law allows, you agree to pay all of TCF's collection costs, actual court costs, other collection expenses, and reasonable attorneys' fees in enforcing any of the terms of your Account Contract, including the collection of any overdrafts on your Account and other amounts you owe under your Account Contract. However, you do not have to pay any amounts TCF pays to an Arbitrator, expert, witness, or attorney in an arbitration of a Claim as described in the section called "Arbitration of Disputes."

2011 Terms at 27; *see also* 2005 Terms at 13 (similar language). TCF responds that this provision only applies to "successful collection actions brought by TCF," *see* Def.'s Reply at 8, but Williams disputes that interpretation, *see generally* R. 26, Pl.'s Surreply.

15

When interpreting a contract, a court will first "examine the language of the contract alone, as the plain and ordinary meaning of the terms are the best indication of the parties' intent." *Intersport, Inc. v. NCAA*, 885 N.E.2d 532, 538 (Ill. App. Ct. 2008) (citation omitted). Dictionary definitions can guide a court in determining plain and ordinary meanings, *see Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1215-16 (Ill. 1992), as can the custom and usage of those terms in the industry of the parties. *Intersport*, 885 N.E.2d at 539.

After examining the language of this provision, the Court concludes that Williams is incorrect: this provision does not apply to *any* lawsuit brought by TCF to enforce the Terms.[5] Significantly, this provision is titled "Default and Collection Costs." The industry custom among banks and other financial institutions is to view "collection" as meaning "debt collection." *See Boulevard Bank*, 15 F.3d at 1426 ("In order to give effect to the term 'collection costs' . . . we ought to construe it to include the major cost items incurred in trying to make good . . . [a] deficiency."). Moreover, *Webster's Third New International Dictionary*[6] defines "collect" as "to claim and receive in payment or fair recompense . . . : to present as due and receive payment." *Webster's Third New International Dictionary* 444 (1986). Likewise, *Black*'s *Law Dictionary* defines "costs of collection" as "[e]xpenses incurred in receiving payment of a note."

---

[5]In doing so, the Court expresses no opinion on whether the "Default and Collection Costs" provision applies to successful or unsuccessful collection actions brought by TCF.

[6]*Webster's Third New International Dictionary* has been cited by the Illinois Supreme Court when interpreting contracts. *See, e.g.*, *Founders Ins. Co. v. Munoz*, 930 N.E.2d 999, 1005 (Ill. 2010); *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 496 (Ill. 2001).

*Black's Law Dictionary* 400 (9th ed. 2009). Thus, the plain and ordinary meaning of this provision limits its scope to actions by TCF to recover amounts owed to it by its customers. Accordingly, it does not coerce TCF customers into accepting arbitration for fear of paying TCF's fees and costs in just any lawsuit. Indeed, the "Default and Collection Costs" provision has no bearing on the arbitration provision: not only is it entirely separate from the arbitration provision, but it also specifically exempts costs incurred in arbitration. 2011 Terms at 27 ("However, you do not have to pay any amounts TCF pays to an Arbitrator, expert, witness, or attorney in an arbitration of a Claim as described in the section called 'Arbitration of Disputes.'") So this argument misses the mark.[7]

As a last point on procedural unconscionability, Williams complains that she did not have a realistic chance to negotiate the substance of the Terms to make them as financially friendly to her as possible. *See* Pl.'s Sur-reply at 3. But such contracts of adhesion "are a fact of modern life," *Kinkel*, 857 N.E.2d at 266, and the lack of negotiation over the arbitration provision does not, standing alone, establish procedural unconscionability. All in all, the arbitration provision is not procedurally unconscionable.

---

[7]It is worth noting that requiring an individual to pay collection costs is not necessarily unconscionable. *Cf.* 20 U.S.C. § 1091a(b)(1) (requiring borrowers who default on student loans to pay "reasonable collection costs"); *Fields v. Wilber Law Firm, P.C.*, 383 F.3d 562, 565 (7th Cir. 2004) ("But when a debtor has contractually agreed to pay . . . collection costs, a debt collector may, without a court's permission, state those . . . costs and include that amount in the dunning letter. Doing so does not violate the [Fair Debt Collection Practices Act].").

### 3. Substantive Unconscionability

Unlike procedural unconscionability, substantive unconscionability "concerns the actual terms of the contract and examines the relative fairness of the obligations assumed." *Kinkel*, 857 N.E.2d at 267 (quoting *Maxwell v. Fidelity Fin. Servs., Inc.*, 907 P.2d 51, 58 (Ariz. 1995)). "Indicative of substantive unconscionability are contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity." *Id.* (internal quotation mark omitted). Williams believes that three features of the arbitration agreement render it substantively unconscionable.

### a. The Terms' Modification Clauses

First, Williams argues that the arbitration agreement is substantively unconscionable because TCF may singlehandedly modify the arbitration clause. This potential for unilateral modification makes the arbitration agreement illusory and one-sided. *See* Pl.'s Resp. at 11. In Illinois, however, such unilateral modification clauses are enforceable if the agreement is terminable at will. *See, e.g.*, *Garber v. Harris Trust & Sav. Bank*, 432 N.E.2d 1309, 1314-15 (Ill. App. Ct. 1982); *accord Bass v. Prime Cable of Chicago, Inc.*, 674 N.E.2d 43, 50-51 (Ill. App. Ct. 1996). In *Garber*, the Illinois Appellate Court held that modification clauses providing that a credit-card issuer could change the terms of its cardholder agreement at any time were enforceable because the cardholder agreement was terminable at the will of either party. *See* 432 N.E.2d at 1314-15. The court reasoned that "[a] contract terminable at the will of either party can be modified at any time by either party as a condition of its continuance," so the

modification clauses "merely express[ed] what the card issuer has the right to do." *Id.* at 1314-15 (citation omitted). Moreover, the court concluded that modifications under these clauses were supported by valid consideration—the extension of credit on the new, modified terms by the card issuer—because it undertook to perform a duty under the new terms that it previously was not obligated to perform. *Id.* at 1315. This same reasoning also applies to non-credit card cases. *Langendorf v. Irving Trust Co.*, 614 N.E.2d 23, 29 (Ill. App. Ct. 1992), *abrogated on other grounds by Brundidge v. Glendale Fed. Bank, F.S.B.*, 659 N.E.2d 909, 914 (Ill. 1995).

Here, the Terms provide that either TCF or its customers may close their accounts at any time. *See* 2011 Terms at 30-31 ("Closing Your Account or Ending Service" provision); 2005 Terms at 10 (same). Nor do the Terms insist that the accounts remain open until some required cancellation date or event. Thus, the Terms are agreements that are terminable at will. *See Bass*, 674 N.E.2d at 51. Accordingly, the modification clauses contained in the Terms are valid and enforceable, even if they allow only TCF to modify the Terms. *See Garber*, 432 N.E.2d at 1315. Moreover, these modification clauses are not illusory. Rather, any modification is supported by valid consideration: the extension of banking services on the new, modified terms by TCF, which was a duty it was previously not obligated to perform. *Id.* The modification clauses in the Terms therefore do not render them substantively unconscionable.

In support of her argument, Williams cites two out-of-jurisdiction cases. In *Morrison v. Amway*, 517 F.3d 248 (5th Cir. 2008), and *In re Zappos.com, Inc. Customer Data Security Breach Litigation*, 2012 WL 4466660 (D. Nev. Sept. 27, 2012), courts

refused to enforce arbitration agreements because one-sided modification clauses rendered them illusory. Those courts refused to enforce the clauses because there were no "savings clauses which preclude[d] application of such amendments to disputes which arose . . . before the amendment." *Morrison*, 517 F.3d at 257; *see also Zappos.com*, 2012 WL 4466660, at *6 ("However, if a consumer sought to invoke arbitration pursuant to the Terms of Use, nothing would prevent Zappos from unilaterally changing the Terms and making those changes applicable to that pending dispute if it determined that arbitration was no longer in its interest.").

Even if those cases had applied Illinois contract law, they would not help Williams's argument because TCF's contract did not purport to render modifications retroactively applicable to already-pending disputes. Specifically, the modification clause in the 2011 Terms provides, "[I]f you have given TCF notice of a Claim under the section called 'Arbitration of Disputes,' no change to the 'Arbitration of Disputes' section after TCF received your notice will apply to the Claim." 2011 Terms at 9. Because this is precisely the type of savings clause that was lacking in *Morrison* and *Zappos.com*, the arbitration provision in the 2011 Terms is not illusory under those cases. As for the 2005 Terms, it is true that its modification clause lacks the same savings clause that is in the 2011 Terms. But no matter: Williams is not in a position to argue that unilateral modification of the 2005 Terms by TCF might retroactively affect any of her arbitration claims. As a new account holder in 2006, she did not have any ongoing arbitration claims against TCF at the time the 2005 Terms were in effect. Thus, the 2005 Terms could not possibly have operated retroactively on her at the time

they governed, which is the fatal flaw that *Morrison* and *Zappos.com* identify. Accordingly, the modification clauses in the two sets of Terms do not render their arbitration provisions substantively unconscionable.

### b. The Arbitration Agreement's Dispute Resolution Exclusions

Second, Williams asserts that the arbitration agreement is substantively unconscionable because it supposedly expressly carves out self-help remedies to protect TCF's rights without resorting to arbitration, but at the same time limits TCF customers to arbitration. Pl.'s Resp. at 12. But there is no one-sided bar on self-help remedies. The plain text of the Terms' arbitration provisions does not prohibit TCF customers from using non-arbitration remedies. According to the 2011 Terms:

> Despite the broad definition of a "Claim" set forth above, *you and TCF* do not have to arbitrate the following (except as stated below in this section):
>
> 1. *Your use or our use* of any self-help or non-judicial remedy. "Self-help" and "non-judicial" remedies are actions *you or we can take* that do not involve court action. An example of this includes setoff rights in your Account.
>
> *You and we* also do not have to arbitrate any individual court action by a party that: (1) is limited to preventing the other party from using a self-help or non-judicial remedy; and (2) does not involve a request for damages or monetary relief of any kind . . . .

2011 Terms at 35 (emphases added). Similarly, the 2005 Terms do not limit the use of non-arbitration remedies by TCF customers:

> [A] "Claim" shall not include the use by *You or TCF* of any self-help or non-judicial remedy, including but not limited to non-judicial remedies to protect TCF's rights, right of set-off, or any individual judicial action *by a party* that is limited to preventing *the other party* from using a self-help or non-judicial remedy and that does not involve a request for damages or monetary relief of any kind.

2005 Terms at 18 (emphases added). Both TCF and TCF customers may also adjudicate disputes in state small-claims court, and do not have to arbitrate bankruptcy disputes over account ownership. *See* 2011 Terms at 35; 2005 Terms at 18. Under the plain language of these arbitration provisions, both TCF and TCF customers have the same rights—unlike in *Ticknor v. Choice Hotels International, Inc.*, a case relied on by Williams. *See* 265 F.3d 931, 940 (9th Cir. 2001) (ruling an arbitration clause unconscionable because it "forced" arbitration on one party while allowing the company to arbitrate or litigate).

Even if TCF could avoid arbitration while TCF customers could not, the parties do not have to bind themselves to identical obligations in order to avoid substantive unconscionability. In Illinois, mutuality of obligation is not essential as long as there is valid consideration. *S.J. Groves & Sons Co. v. State*, 444 N.E.2d 131, 134 (Ill. 1982) (quoting *Armstrong Paint & Varnish Works v. Continental Can Co.*, 133 N.E. 711, 714 (Ill. 1921)), *overruled on other grounds by Rossetti Contracting Co., Inc. v. Court of Claims*, 485 N.E.2d 332, 335 (Ill. 1985). There is a broad definition of consideration in Illinois; "a mutual promise to arbitrate is sufficient consideration to support an agreement to arbitrate," even if the parties do not agree to identical obligations. *Bishop v. We Care Hair Dev. Corp.*, 738 N.E.2d 610, 623 (Ill. App. Ct. 2000). Banking services provided by TCF would also be valid consideration. *Cf. Oblix, Inc. v. Winiecki*, 374 F.3d 488, 491 (7th Cir. 2004) (arbitration clause requiring employee, but not employer, to arbitrate all claims was supported by consideration comprised of the salary provided by the employer). So there is valid consideration supporting the arbitration provisions

22

here, even if TCF's dispute resolution obligations were less onerous on itself than on its customers.

Williams's argument to the contrary relies on cases from states whose law requires mutuality of obligation (which Illinois law does not). *See Bragg v. Linden Research, Inc.*, 487 F. Supp. 2d 593, 607 (E.D. Pa. 2007) ("[T]he arbitration remedy must contain a 'modicum of bilaterality.'" (citation omitted)); *Comb v. PayPal, Inc.*, 218 F. Supp. 2d 1165, 1173 (N.D. Cal. 2002) ("The Court's principal substantive concerns in the present case are a lack of mutuality in the User Agreement . . . ."). Consequently, any lack of mutuality that Williams identifies in the arbitration provisions' dispute-resolution exclusions do not render the provisions substantively unconscionable.

### c. Costs of Arbitration

Finally, Williams attacks what she calls the high and uncertain costs of arbitration, which she believes discourage customers from pursuing legal action against TCF. Pl.'s Resp. at 13-14. If "a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000). The mere "'risk' that [plaintiff] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." *Id.* at 91.

Williams cannot show that arbitration under the 2011 Terms is too costly. Any agreement by the defendant to pay "all costs associated with arbitration forecloses the possibility that the [plaintiff] could endure any prohibitive costs in the arbitration

process." *Livingston v. Assocs. Fin., Inc.,* 339 F.3d 553, 557 (7th Cir. 2003) (citation omitted) (emphasis omitted). In the 2011 Terms' arbitration provision, TCF promises to "pay all filing, hearing, and other fees the arbitration organization charges you for any Claim you assert in arbitration after you have paid an equivalent amount (if any) for filing the Claim in state or federal court." 2011 Terms at 36. Moreover, TCF will pay all costs of an appeal from the arbitrator's award if the customer wins the appeal. *Id.* Because TCF has agreed, in the 2011 Terms, to absorb much of the costs of arbitration (above and beyond a court filing fee), Williams will not have to endure prohibitive costs in the arbitration process.

Nor has Williams carried her burden to show overly burdensome arbitration costs under the 2005 Terms (if those Terms were the applicable ones). To be sure, unlike the 2011 Terms, the 2005 Terms cap the amount of arbitration fees that TCF will pay at $2,500, and specify that "the costs of the appeal will be paid by the appealing party no matter which party wins the appeal." 2005 Terms at 20, 21. A party may only appeal an award exceeding $100,000, and that appeal is heard by a three-arbitrator panel. *Id.* at 20. Although these arbitration-cost provisions are less customer-friendly than the provisions in the 2011 Terms, Williams still carries the burden to show more than a speculative risk that arbitration would be prohibitively expensive. *Green Tree*, 531 U.S. at 91; *see also Williams v. Jo-Carroll Energy, Inc.*, 890 N.E.2d 566, 573 (Ill. App. Ct. 2008) ("Moreover . . . plaintiff has not demonstrated that the cost of an arbitration hearing will be greater than that of litigating the case in court."). The only evidence she provides about the prohibitively expensive costs of

arbitration is this statement: "If I believed I had a legal claim against TCF but was required to pay any costs in excess of $2,500 in order to initiate arbitration against TCF, I would be unable and unwilling to do so before I knew what those costs might be." Pl.'s Aff. ¶ 14. This bare assertion is too speculative to warrant not enforcing the arbitration provision on that basis, especially because the statement does not say why bearing arbitration costs is any different than bearing the costs of litigation in court.

Indeed, Williams did not respond to TCF's proffered evidence showing that the costs of arbitration, for a claim like this, would in all likelihood not be prohibitively expensive. In the exhibits to TCF's reply brief, TCF includes a fee schedule for the American Arbitration Association, one of the two arbitration providers specified in the 2005 Terms. *See* 2005 Terms at 19. That fee schedule caps the portion of the arbitrator's fees that a consumer would pay at $125 (if the consumer's claim or counterclaim does not exceed $10,000), and $375 (if the consumer's claim or counterclaim is between $10,000 and $75,000).[8] *See* R. 25-2, Def.'s Exh. 2 at 1; *see also Zobrist v. Verizon Wireless*, 822 N.E.2d 531, 540 (Ill. App. Ct. 2004) (determining, from the American Arbitration Association fee schedule, that the excessive-costs argument was insufficient to invalidate the arbitration agreement), *abrogated on other grounds by Kinkel*, 857 N.E.2d at 263.

---

[8]The National Arbitration Forum, the other arbitration provider specified in the 2005 Terms, caps the portion of the arbitrator's fees that a consumer would pay at $250 (for all claims less than $75,000). Although TCF did not provide this information in the exhibits to its reply brief, the fee schedule can be found at http://www.adrforum.com/users/naf/resources/2008FeeSchedule-FinalPrint1.pdf.

As to the costs of an appeal from an adverse arbitration decision, Williams has not responded to TCF's evidence that TCF customers do win arbitration awards in claims like hers, so her fears about paying all of the costs of an appeal might be unwarranted. *See* R. 25-1, Def.'s Exh. 1 at 1-2 (results of actual and threatened arbitrations asserted by TCF customers against TCF concerning overdraft-fee disputes from 2006 to the present). Williams also cites two Northern District of California cases for the assertion that arbitration provisions imposing substantial fees and costs in pursuit of an appeal are substantively unconscionable. *See Trompeter v. Ally Fin., Inc.*, 2012 WL 1980894 (N.D. Cal. June 1, 2012); *Lau v. Mercedes-Benz USA, LLC*, 2012 WL 370557 (N.D. Cal. Jan. 31, 2012); *see also* Pl.'s Resp. at 14.

The claims that the respective customers sought arbitration for in *Trompeter* and *Lau*, however, were breach of warranty claims for defective automobiles under California's "lemon law," which necessarily involved higher amounts in controversy than this case. *See Trompeter*, 2012 WL 1980894, at *5; *Lau*, 2012 WL 370557, at *1. In *Trompeter*, the court concluded that the $100,000 threshold for an appeal favored car lenders over car buyers because a buyer suing a lender over a defective car would likely have a claim greater than the threshold, but a suit by a lender against a buyer would likely be less than the threshold. 2012 WL 1980894, at *5. Thus, the lender's arbitration provision impermissibly favored the lender by stacking the deck against car buyers who wanted to appeal but could not. *Id.* Putting aside the fact that *Trompeter* did not analyze costs of appeal, the imbalance warned of in *Trompeter* is not presented here: Williams does not propose of any type of claim where a suit by TCF against a

customer would be greater than the threshold, but a suit vice-versa would not. And although *Lau* (the other case cited by Williams) did analyze costs of appeal, that court noted that, given the great expense of a defective car, the plaintiff would have to advance between $10,000 and $15,000 to arbitrate, and those costs would multiply given an appellate panel of three arbitrators. 2012 WL 370557, at *9-10. Even if the arbitration and appeal costs that Williams is likely to incur are around the same costs as in *Lau*, the customer in *Lau* carried his burden by actually projecting his arbitration costs for the court, *see id.* at *9, whereas Williams has not. So Williams cannot prove this arbitration provision is substantively unconscionable because of excessive costs. The arbitration provision withstands the challenge to its substantive reasonableness.

### III. Conclusion

For the reasons stated above, the arbitration agreements contained in the 2011 and 2005 Terms are valid and enforceable. TCF's motion to compel arbitration [R. 10] is granted. The claims stated in the Complaint [R. 1] must be arbitrated and the litigation is stayed pending that arbitration. The status hearing of February 28, 2013 is reset to April 4, 2013 at 10:30 a.m. The parties shall file, on April 2, a joint status report concerning the status of the arbitration.

ENTERED:

*Edmond E. Chang*

Honorable Edmond E. Chang
United States District Judge

DATE: February 26, 2013